No. 2121.

## William Groom *v.* The State.

ON REHEARING.

1. **Theft—Ownership—Evidence.**—See the opinion and the statement of the case for evidence *held* insufficient to support a conviction for theft, because insufficient to support the allegation of ownership.

2. **Same.—Bill of Sale** executed by the general owners of the cattle subsequent to the alleged theft of the same from the special owner, was improperly admitted, because irrelevant, and because, not being of record at the time of the theft, it was not evidence of ownership.

3. **Same—Jury Law.**—A citizen, house holder and voter of an unorganized county is a competent juror to serve on juries impaneled in the organized county to which the unorganized county of his residence was attached for judicial purposes.

Appeal from the District Court of Wheeler. Tried below before the Hon. Frank Willis.

The conviction in this case was for the theft on February 8, 1886, of two head of cattle, the property of Thomas T. McGee, in Hemphill county, Texas, an unorganizing county attached to the said Wheeler county for judicial purposes. The penalty as-

sessed against the appellant was a term of two years in the penitentiary.

Frank Black was the first witness for the State. He testified that he lived with defendant at the time of the alleged offense, in Hemphill county, Texas. Some time after witness entered defendant's service, in December, 1885, defendant directed his two sons to drive up a Maverick for beef. The boys drove up a bunch of cattle, one of which was killed by defendant. That animal was branded PO on the left·hip, and, the witness thought, with a lateral P on the left side. It was marked with an upper and underbit, certainly in one ear, and, the witness thought, in both. The flesh of that animal was consumed by defendant's family. Part of the hide was cut into strips and used in tying up brush. The remaining part of the hide and the ears were thrown into an old well. The head was taken off and secreted, and the shank bones were thrown into a creek. After the animal was killed. witness told the defendant that the beef was a PO animal. He replied that he was aware of that fact, and that he was feeding some of the PO cattle, and had authority to kill them. On or about February another PO animal was driven up by the defendant's boys, by his direction, and was killed by him. The hide was destroyed and the meat eaten by defendant's family. The two animals described were branded as the PO animals usually were. Had they been otherwise branded, witness would have observed it.

Cross-examined, the witness said that, at present, he had apartments in the county jail, wherein he was detained under an indictment charging him with the theft of the defendant's horse. He was not, however, guilty of that theft, but, on the contrary, purchased the said horse from the defendant, relinquishing to the defendant, in part, wages due him by defendant for services rendered. He rode the horse from the defendant's house to Mobeetie, and then to Tascosa, in Oldham county, where he was arrested. He told Mr. Arnold at the diamond F ranch, before his arrest for the theft of the horse, of the theft of the cattle by the defendant. He told Arnold that he knew a man who, when he wanted beef, would go out and kill the first fat one he came across. After his arrest the witness told Mr. Pierce about the defendant stealing the PO cattle. Witness would not swear positively that the animals killed by defendant had a lateral or lazy P branded on their left sides, but such was his impression. He may have obtained that impression from the

fact that defendant was milking some cows branded PO and a lateral P.

T. T. McGee testified, for the State, that, some time in March or April, 1886, he was summoned to the defendant's house by Capt. G. W. Arrington to search for evidences of the theft of PO cattle, of which brand of cattle the witness was then the manager.  He found Arrington at defendant's house, with Frank Black, whom he had brought along to aid in the search.  Black said that some of the hides were buried on top of defendant's "dug out." But one side of the roof was molested, and no hides were there found.  Black then showed the fence of the corral, which was tied with strips of a white and red-roan cow hide, and said that the strips came from the hide of a PO cow killed by defendant.  Defendant said the strips were from the hide of a PO cow which died in the brush, and which he partly skinned.  Witness asked defendant to lead the way to the carcass.  Black then led the the way to an old well near the "dug out" and fished out some pieces of hide.  Defendant said those pieces of hide were cut from dead cattle by his little boys and thrown into the old well for softening preparatory to the manufacture of quirts.  Witness then asked defendant if he had killed any beef lately.  He replied that he killed one of his own and sold the hide in town.  Black then led the way to where he said the two PO cattle were killed, and showed two paunches split open.  The two paunches were about thirty yards apart.  Defendant said that the paunches indicated where two "dogies" (South Texas stock) had died.  He said the two "dogies" had been hauled off, but did not know where to nor by whom.  Black then led the way to a creek near by and fished out some shank bones, the hair on which corresponded with the pieces found in the well and the strips on the fence.  Defendant said that the shank bones came from the animal of his own which, he said, he killed where the nearest paunch was found.  He had but recently before said that the paunch was that of a "dogie" which had died.  Defendant was then told to show the remains of the PO cow he found dead and had partly skinned.  He led the way to the remains of a red animal and a white animal, both of which resembled South Texas "dogies."  Witness told defendant that the hides of those animals did not correspond with the hide strips on the fence.  He then said that another animal, the brand of which he did

not know, was killed on the spot where he had before said the second "dogie" died. He charged that Black killed that animal.

Captain G. W. Arrington corroborated the witness McGee, and added that, when the defendant was "cornered up" and requested to show the remains of the animal from which the fence strips were taken, he replied: "Well, if you must know, there is the man who killed it," pointing to Black. Black said, "You are a d—d liar; you killed it yourself;" to which defendant made no reply.

The opinion sufficiently describes the documentary evidence introduced by the State.

The defense introduced a number of witnesses who testified that they had known the defendant's reputation for honesty and fair dealing for various periods, and that it was good. A number of the same witnesses and others testified that the reputation of the State's witness, Black, for honesty and truth and veracity was very bad.

*J. N. Browning*, for the appellant.

*J. H. Burts*, Assistant Attorney General, and *Grigsby & Houston*, for the State.

WILLSON, JUDGE. On a previous day of our present term we affirmed the judgment of conviction in this case. At the time the case was considered and determined by the court we did not have the benefit of a brief or argument in behalf of the defendant. Upon this motion for a rehearing, counsel for defendant has submitted an able and full brief of the case, and at the request of the court has also argued orally the questions relied upon by him for a reversal of the judgment. In the light of the brief and argument of counsel, we have carefully and thoroughly reconsidered the record, and we are convinced that we were in error in affirming the judgment, because, in our opinion, the conviction is not supported by the evidence. We do not think the evidence establishes the allegation as to the ownership of the alleged stolen cattle.

It is alleged in the indictment that Thomas T. McGee owned said cattle. It is shown by the evidence that, at the time of the alleged theft, said McGee managed the cattle in that section in the PO brand. He testified that he had been manager of the PO ranch and cattle since February, 1885. He did not claim to

be the *general,* but only the *special* owner of the cattle in the
PO brand.   By the witness Black, the State proved that the
alleged stolen cattle were branded PO on the left hip, and he
thought that they were also branded on the left side with a lat-
eral or lazy P—but he was not certain that they were branded
with said lateral or lazy P.   There was no other evidence as to
the brand upon the alleged stolen cattle.   McGee testified noth-
ing as to the ownership of the particular cattle alleged to have
been stolen.   No other witness except Black testified to any fact
tending to identify said cattle as the property of McGee.   For
the purpose of establishing the allegation of ownership, the
State read in evidence the record of a mark and brand recorded
in the name of R. Moody & Co., date of record September, 1880.
The mark was an underbit and overbit in each ear; the brand
PO on the left hip, and ⊢ɥ on the left side.   Black testified that
the alleged stolen cattle, he *thought,* but was not sure, were in
this mark and brand.   If the said cattle were in fact in this
recorded mark and brand, the evidence would sufficiently prove
the ownership of the cattle to have been in R. Moody & Co. at
the date of the alleged offense.   But the testimony of the wit-
ness Black as to the mark and brand of the said cattle is very
indefinite and unsatisfactory, even if he was a credible witness,
which the evidence clearly shows he was not.

But even should it be conceded that the alleged stolen cattle
were in the recorded mark and brand of R. Moody & Co., who
were the general owners of cattle in that mark and brand at the
date of the alleged theft, this does not prove ownership of the
cattle in McGee.   It was not proved that McGee owned, managed
or controlled the cattle in said mark and brand.   He testified that
he managed cattle in the PO brand, but it is not shown that the
PO brand is the same as the recorded brand of R. Moody & Co.,
to wit:   PO on the left hip and ⊢ɥ on the left side.   It might be
inferred, perhaps, that the two brands are identically the same,
and that the witnesses, in speaking of the PO brand, meant the
said recorded brand of R. Moody & Co.   But the liberty of the
citizen can not be taken away by a mere inference of a material
fact, especially when such fact, did it exist, could easily be
proved.   It was not for the jury to assume, in the absence of
proof of the fact, that the recorded brand of R. Moody & Co.
was identical with the PO brand which McGee testified he man-
aged.   The PO brand may be an entirely different one from the
said recorded brand, and, if so, it was not proved that the

alleged stolen cattle were in the PO brand, for Black, the only witness who testified as to the brand of said cattle, said that he thought they were not only branded PO but were branded ⱶ on the side. Besides, if the PO brand is not identical with the said recorded brand, it was not recorded, and was not evidence of ownership.

It seems from the evidence that after the date of the alleged theft R. Moody & Co. sold and transferred their cattle and brand to the Moody & Andrews Land and Cattle Company, who had said brand again recorded in the name of said company. This record was read in evidence over defendant's objections, and the correctness of this ruling of the court is questioned by proper bill of exception. We can not perceive any legitimate bearing that this record could have upon any issue in the case. At the time of the alleged theft the Moody & Andrews Land and Cattle Company certainly did not own the cattle in said brand, although they did own the same subsequently. We think this record should have been excluded because irrelevant. Furthermore it was not sufficient evidence of itself to prove ownership in said company, not having been recorded in the name of said company at the time of the alleged theft. (Priesmuth v. The State, 1 Texas Ct. App., 480; Spinks v. The State, 8 Texas Ct. App., 125; Harvey v. The State, 21 Texas Ct. App., 178.)

It is alleged in the indictment, and the proof shows that the venue of the offense was Hemphill county, an unorganized county attached to Wheeler county for judicial purposes. In impaneling the jury one I. B. Wood, a citizen of said Hemphill county, was presented to serve as a juror in the case. Defendant objected to said Wood as a juror, because he was not a citizen of Wheeler county, etc. The court overruled the objection, and, the defendant having exhausted his challenges, said Wood served as a juror in the trial of the cause, and this proceeding is presented by bill of exception for our revision. We are of the opinion that Wood was a qualified juror, notwithstanding he did not actually reside, and could not legally vote in said Wheeler county. Hemphill county, having been by law attached to Wheeler county for judicial purposes, was, for such purposes, a part of Wheeler county, and for such purposes its citizens must be regarded as citizens, voters and householders of said Wheeler county. For all judicial purposes, the two counties are to be regarded as but one, and for such purposes Wheeler county embraced and exercised complete jurisdiction over all the terri-

tory within the bounday lines of both counties. It can not be questioned that the impaneling and service of a jury come within the meaning of the words "judicial purposes." We hold, therefore, that said Wood was a qualified juror to serve in the trial of this cause.

Because, in our opinion, the evidence is insufficient to support the conviction, in that it does not prove the allegation as to the ownership of the alleged stolen cattle, the motion for rehearing is granted, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 12, 1887.